## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) ALANA CRAWFORD, as Special Administrator of the Estate of DEAN STITH, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.:  24-cv-6-SH |
| (1) TURN KEY HEALTH CLINICS, LLC, (2) VIC REGALADO, in his official capacity, (3) SARAH LEWIS, LPN, (4) RHONDA HILGER, APRN, | ) ) ) ) ) | Jury Trial Demanded<br><br>Attorney Lien Claimed |
| Defendants. | ) | |

## COMPLAINT

**COMES NOW**, Alana Crawford, ("Plaintiff"), as the Special Administrator of the Estate of Dean Stith ("Mr. Stith"), deceased, and for her causes of action against the above-named Defendants, alleges and states the following:

## PARTIES, JURISDICTION AND VENUE

1.   Plaintiff was, at the pertinent times underlying this Complaint, a resident of Tulsa County, Oklahoma. Plaintiff is the Special Administrator of the Estate of Dean Stith, deceased. The causes of action in this matter are based on violations of Mr. Stith's rights under the Fourteenth Amendment to the United States Constitution.

2.   Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability company doing business in Tulsa County, Oklahoma.  Turn Key is a private correctional health care company that contracts with counties, including, during the pertinent timeframe, Tulsa County, to provide medical professional staffing, supervision and care in county jails. Turn Key was at all times relevant hereto responsible, in part, for providing medical services, supervision and medication to Mr. Stith while he was in the custody of the Tulsa County Sheriff's Office ("TCSO").

Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees. Turn Key was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

3.      Defendant Vic Regalado ("Sheriff Regalado" or "Defendant Regalado") is the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of State law. Sheriff Regalado is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.*, 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff Regalado in his official capacity, Plaintiff has brought suit against the County/TCSO. The Tulsa County Sheriff is the "Tulsa County official responsible for promulgating and enforcing policies for the [Jail], providing medical care to inmates and detainees, and operating the jail on a daily basis." *Wirtz v. Regalado*, No. 18-CV-0599-GKF-FHM, 2020 WL 1016445, at *6 (N.D. Okla. Mar. 2, 2020) (citing See 19 Okla. Stat. § 513; *Estate of Crowell ex rel. Boen v. Bd. of Cty. Comm'rs of Cleveland Cty.*, 237 P.3d 134, 142 (Okla. 2010)).

4.      Defendant Sarah Lewis, LPN ("Nurse Lewis") was, at all times relevant hereto, an employee and/or agent of Turn Key, who was, in part, responsible for overseeing Mr. Stith's health and well-being, and assuring that Mr. Stith's medical/mental health needs were met, during the time he was in the custody of TCSO. At all times pertinent, Nurse Lewis was acting within the scope of her employment and under color of law. Nurse Lewis is being sued in her individual capacity.

2

5.     Defendant Rhonda Hilger ("APRN Hilger") was, at all times relevant hereto, an employee and/or agent of Turn Key, who was, in part, responsible for overseeing Mr. Stith's health and well-being, and assuring that Mr. Stith's medical/mental health needs were met, during the time he was in the custody of TCSO. At all times pertinent, APRN Hilger was acting within the scope of her employment and under color of law. Nurse Lewis is being sued in her individual capacity.

6.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

7.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

8.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since claims form part of the same case or controversy arising under the United State Constitution and federal law.

9.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

10.     Paragraphs 1-9 are incorporated herein by reference.

### A.  Facts Specific to Mr. Stith

11.     Upon information and belief, Mr. Stith, a 55-year-old Black man, was booked into the Tulsa County Jail shortly before midnight on December 24, 2021 after being arrested for the non-violent misdemeanor of false reporting of a crime.

12.    Mr. Stith suffered from numerous pre-existing medical and mental health conditions, including hypertension, bipolar disorder and/or schizophrenia, and serious dementia, which was obvious even to a layperson. Indeed, upon information and belief, the charges Mr. Stith faced - false reporting of a crime – were the result of symptoms of his dementia.

13.    At all pertinent times, Mr. Stith was a pre-trial detainee.

14.    During the book-in process, on December 25, 2021 at approximately 12:14 a.m., Turn Key employee/agent James Flora, LPN filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Mr. Stith: was being treated for hypertension; had an unstable gait; had open sores and wounds on both of his hands; was disheveled, disorderly, and insensible.

15.    Upon information and belief, Mr. Stith also displayed obvious signs of dementia, such as confusion, disorientation, forgetfulness, and trouble effectively communicating.

16.    Mr. Stith's vital signs were taken during the intake process and were as follows: his blood pressure was 152/81 and his sitting pulse was 94.

17.    As Mr. Stith's blood pressure and pulse were abnormally high, Nurse Flora, per Turn Key's chronic care and cardiovascular policies/protocols, charted, "task for bp checks for 1 week, then chronic care for chart check."

18.    Upon information and belief, Mr. Stith was initially recommended to be housed in general population at the Jail despite displaying objectively serious symptoms of his medical and mental health conditions.

19.    At approximately 5:21 p.m. on December 25, Mr. Stith's blood pressure was measured at 147/92, which is also high.

20.    On December 28, 2021, Mr. Stith's blood pressure was measured at 143/94 – still elevated – yet he was not started on any medication or referred to a physician.

21.    On December 29, Turn Key Licensed Professional Counselor ("LPC") Roshell Mayberry saw Mr. Stith during mental health rounds.

22.    LPCs are not authorized or qualified to provide any medical or psychiatric evaluation, treatment, or assessment.

23.    Ms. Mayberry noted that Mr. Stith "appeared to become agitated over his water being shut off. [Ms. Mayberry] attempted to redirect/calm patient down but unable to calm him down. Patient refused to answer questions, continued to ask MHP and DO for water. Referral to restart meds. F/U as needed."

24.    Mr. Stith submitted a grievance on December 31 which stated, "my skin peeling [sic] off[,] please help me. [P]lease." This was an obvious sign of a severe and escalating mental health problem.

25.    Upon information and belief, Mr. Stith's obviously serious signs of dementia, including confusion, disorientation, forgetfulness, mood swings, and trouble effectively communicating continued unabated and untreated.

26.    Upon information and belief, on January 4, 2022, Turn Key LPC Sara Hardy saw Mr. Stith on mental health rounds.

27.    Hardy noted that Mr. Stith, "asked who this MHP was even though he has seen this MHP several times in the past while in jail." Hardy additionally noted that Mr. Stith was "focused on getting more food and was hiding his tray under his bed."

28.    Further, Hardy noted that Mr. Stith's "skin appeared very dry … He was mumbling, did not look at this MHP."

29.    Despite acknowledging Mr. Stith's obvious signs of a serious mental health condition, Hardy failed to refer him to a physician or provide any treatment.

30.    Mr. Stith's condition continued to deteriorate throughout his stay at the Jail.

31.    On January 5, 2022, at approximately 1:47 p.m., LPC Hardy saw Mr. Stith on "mental health"/"segregation rounds." LPC Hardy noted that Mr. Stith was anxious/agitated, angry/oppositional" and "refused to engage." Mr. Stith reportedly told LPC Hardy to "go away."

32.    On January 5, 2022, at approximately 4:29 p.m., Turn Key Nurse Practitioner Megan Rasor saw Mr. Stith for the purported purpose of "[hypertension] and wounds to BLE." NP Rasor charted that Mr. Stith was unable to recall his medication regimen and was "A&O [alert and oriented] to person and place only. Patient **has 2+ pitting edema to BLE with multiple open areas...**[1] Patient to wear compression hose but is noncompliant."

33.    Upon information and belief, sometime in the morning of January 6, 2022, Mr. Stith was moved from general population to the medical housing unit due to his increasingly severe mental health symptoms.

34.    On January 6, Turn Key Nurse Markia Brice, LPN, "assessed"[2] Mr. Stith.

35.    Nurse Brice charted that Mr. Stith was **still unsteady on his feet and had an unsteady gait**.

---

[1]    Pitting edema is when a swollen part of your body has a dimple (or pit) after you press it for a few seconds. It can be a sign of a serious health issue, such as a blood clot, congestive heart failure, kidney disease, liver disease or *lung disease*. Nurse Lewis' note indicates that Mr. Stith had pitting edema in both legs.

[2]    As an LPN, Nurse Brice was not qualified to make a diagnosis or prescribe medication or any kind of treatment plan. LPNs have about a year of nursing education, often culminating in a certificate. The role of an LPN is, as the name suggests, practical. Typical duties for which an LPN is qualified are: record a patient's health history; administer medications (under the supervision of an RN or physician); perform wound care; measure and record vital signs; observe a patient's condition. "LPNs cannot diagnose any medical condition or prescribe any medication." *See* American College Health Association Guidelines February 2023, https://www.acha.org/documents/resources/guidelines/ACHA_Scope_of_Practice_for_Colleg e_Health_LPNs_Feb2023.pdf. LPNs are expected to report even minor changes in patient care to a registered nurse or other medical professional. *See also, Estate of Jensen by Jensen v. Clyde,* 989 F.3d 848, 852 (10th Cir. 2021) ("An LPN designation does not require an associate's or bachelor's degree ... [LPNs are] prohibited from prescribing medications, conducting health assessments, and diagnosing medical conditions.").

36.   On January 6 at approximately 3:08 p.m., LPC Hardy saw Mr. Stith on mental health rounds. She noted that Mr. Stith was still anxious, agitated, angry, and oppositional. She also noted that Mr. Stith "asked several times what time it was, if his light could be turned off then on. He appeared disheveled."

37.   The following day, January 7, Mr. Stith's blood pressure was measured at 101/68, his pulse was 60, which is in the low range. Inexplicably, his oxygen saturation was not taken.

38.   Also on January 7, Judy Wagga, a Turn Key Psychiatric Nurse Practitioner, saw Mr. Stith and noted that he "appeared to be responding to internal stimuli." This was a sign that Mr. Stith was suffering from acute psychosis, an emergent situation.

39.   On January 8, 2022, Mr. Stith's pulse rose to 98 and his blood pressure rose to 124/97. Yet, despite these fluctuations, Mr. Stith was not put on any blood pressure medicine or given additional treatment.

40.   Later on January 8, Turn Key psychologist Alicia Irvin, Ph.D., saw Mr. Stith.

41.   Dr. Irvin noted that Mr. Stith was confused, disoriented, and did not "cognitively comprehend." Dr. Irvin's "plan" was merely to keep Mr. Stith on mental health observation but ordered no additional treatment.

42.   On January 9 at approximately 10:30 a.m., Dr. Irvin noted Mr. Stith's dementia and wrote that he had slurred speech, a new alarming symptom, and was not responding appropriately to questions. Dr. Irvin described Mr. Stith as having a "Major Neurocognitive Disorder." But Mr. Stith was not sent to an outside medical provider nor referred to a physician.

43.   Mr. Stith's pulse had also plummeted to 56, which is considered bradycardia.  Bradycardia can be a serious problem if heart can't pump enough oxygen-rich blood to the body. Symptoms of bradycardia include confusion, such as the confusion repeatedly displayed by Mr. Stith.

44.   By this point it was abundantly clear that Mr. Stith was suffering from a condition that could not be adequately treated in a correctional setting. With negligence and deliberate indifference, Dr. Irvin, who is not a physician, failed to call for an ambulance or otherwise ensure that Stith was urgently evaluated by a physician.

45.   At approximately 2:46 p.m. on January 9, Turn Key Nurse Sarah Lewis, LPN, observed Mr. Stith ***"drooling, tangential thought, not responding appropriately to questions, diminished skin turgor,[3] 2+ pitting edema to BLEs, and full body weakness."*** Nurse Lewis also noted that Mr. Stith was ***unable to urinate***.

46.   Particularly when coupled with his worsening condition over a period of days,  Nurse Lewis' note clearly reflects that Mr. Stith was in a dire condition and in obvious need of emergent care that could not be provided in a correctional setting. Nonetheless, with negligence and deliberate indifference, Nurse Lewis failed to call for an ambulance or even contact a physician.

47.   Nurse Lewis did call Turn Key APRN Rhonda Hilger at 3:02 p.m., and, on information and belief, informed APRN Hilger of Mr. Stith's emergent and dire condition, yet, with negligence and deliberate indifference, Hilger did not order that Mr. Stith be sent to the hospital.

48.   In the alternative, if Nurse Lewis did not notify APRN Hilger of Mr. Stith's emergent and dire condition, this constitutes another instance of negligence and deliberate indifference.

49.   On January 10, 2022, at approximately 4:05 a.m., Mr. Stith was found wedged between his bunk and the wall in his cell. TCSO Detention Officer Davis notified Turn Key Nurses Nikki Copeland and Sarah Schumacher, who found that Mr. Stith was "cool to the touch and arms contracted to chest."

---

[3]       A decrease in skin turgor is a late sign of dehydration.

50.    EMSA was called and paramedics arrived at approximately 4:39 a.m., finding Mr. Stith unresponsive. The EMSA paramedics documented that Jail ***"health care staff are poor historians* and are unsure of timeline."**

51.    The paramedics noted that Mr. Stith was displaying decorticate posturing, which is a pose in which someone has rigid, extended legs, arms bent toward the center of their body, pointed and turned in toes, curled wrists, and balled hands. Decorticate posturing is caused by abnormal brain conditions such as a stroke, concussion, traumatic brain injury, brain bleed, brain tumor, or infection.

52.    The paramedics found that Mr. Stith's pulse was in the 30s and he was having trouble breathing.

53.    Mr. Stith was transferred to St. John Medical Center where he presented in cardiac arrest.

54.    Providers at St. John were unable to resuscitate Mr. Stith, who passed away shortly after his arrival.

55.    The Office of the Chief Medical Examiner of Oklahoma determined that Mr. Stith died due to: 1) acute bronchopneumonia[4] due to complications of COVID-19; and 2) hypertensive atherosclerotic cardiovascular disease.

## B. The Jail's Unconstitutional Health Care Delivery System / Policies and Customs

56.    The deliberate indifference to Mr. Stith's serious medical needs and his safety, as summarized *supra*, was in furtherance of and consistent with: a) policies, customs, and/or practices which TCSO promulgated, created, implemented or possessed responsibility for the continued

---

[4]    Symptoms of bronchopneumonia include muscle aches, confusion or delirium.

operation of; and b) policies, customs, and/or practices which Turn Key developed and/or had responsibility for implementing.

57.    To the extent that no single officer or professional violated Mr. Stith's constitutional rights, Tulsa County/Sheriff and Turn Key are still liable under a theory of a systemic failure of policies and procedures as described below. There were such gross deficiencies in medical procedures, staffing and facilities and procedures that Mr. Stith was effectively denied constitutional conditions of confinement.

58.    There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail. Both Sheriff Regalado and Former Sheriff Stanley Glanz have long known of these systemic deficiencies and the substantial risks they pose to inmates like Plaintiff but failed to take reasonable steps to alleviate those deficiencies and risks.

59.    For instance, in 2007, the NCCHC, a corrections health accreditation body, conducted an on-site audit of the Jail's health services program. At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls, failure to conduct quality assurance studies, and failure to address health care needs in a timely manner. NCCHC made these findings of deficient care despite Former Sheriff Glanz's/TCSO's efforts to defraud the auditors by concealing information and falsifying medical records and charts.

60.    Former Sheriff Glanz failed to change or improve any health care policies or practices in response to NCCHC's findings.

61.    There is a long-standing failure to secure adequate mental health care, and to properly classify and protect inmates with obvious and serious mental health needs.  For example, in 2009,

TCSO was cited by the Oklahoma State Department of Health for violation of the Oklahoma Jail Standards in connection with the suicide death of an inmate with schizophrenia.

62.     In August of 2009, the American Correctional Association ("ACA") conducted a "mock audit" of the Jail.   The ACA's mock audit revealed that the Jail was non-compliant with "mandatory health standards" and "substantial changes" were suggested.  Based on these identified and known "deficiencies" in the health delivery system at the Jail, the Jail Administrator sought input and recommendations from Elizabeth Gondles, Ph.D. ("Dr. Gondles").  Dr. Gondles was associated with the ACA as its medical director or medical liaison. After reviewing pertinent documents, touring the Jail and interviewing medical and correctional personnel, on October 9, 2009, Dr. Gondles generated a Report, entitled "Health Care Delivery Technical Assistance" (hereinafter, "Gondles Report").   The Gondles Report was provided to the Jail Administrator, Michelle Robinette.  As part of her Report, Dr. Gondles identified numerous "issues" with the Jail's health care system, as implemented by the Jail's former medical provider, CHC.  After receiving the Gondles Report, Chief Robinette held a conference -- to discuss the Report -- with the Undersheriff, Administrative Captain and CHC/CHM.

63.     Among the issues identified by Dr. Gondles, as outlined in her Report, were: (a) understaffing of medical personnel due to CHM misreporting the average daily inmate population; (b) deficiencies in "doctor/PA coverage"; (c) a lack of health services oversight and supervision; (d) failure to provide new health staff with formal training; (e) delays in inmates receiving necessary medication; (g) nurses failing to document the delivery of health services; (h) systemic nursing shortages; (h) failure to provide timely health appraisals to inmates; and (i) 313 health-related grievances within the past 12 months.  Dr. Gondles concluded that "[m]any of the health service delivery issues outlined in this report are a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private

provider."  Based on her findings, Dr. Gondles "strongly suggest[ed] that the Jail Administrator establish a central Office Bureau of Health Services" to be staffed by a TCSO-employed Health Services Director ("HSD").  According to Dr. Gondles, without such an HSD in place, TCSO could not properly monitor the competency of the Jail's health staff or the adequacy of the health care delivery system.

64.      Nonetheless, TCSO leadership chose not to follow Dr. Gondles' recommendations. TCSO did not establish a central Office Bureau of Health Services nor hire the "HSD" as recommended. Id.

65.      On October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to Josh Turley, TCSO's "Risk Manager".  In the email, Ms. Wyrick voiced concerns about whether the Jail's medical provider, Defendant CHMO, a subsidiary of CHC, was complying with its contract. Ms. Wyrick further made an ominous prognosis: "This is very serious, especially in light of the three cases we have now - what else will be coming? It is one thing to say we have a contract ... to cover medical services, it is another issue to ignore any and all signs we receive of possible [medical] issues or violations of our agreement with [CHC] for [health] services in the jail.  The bottom line is, the Sheriff is statutorily obligated to provide medical services."

66.      NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

67.      NCCHC once again found numerous serious deficiencies with the health services program. As part of the final 2010 Report, NCCHC found, inter alia, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year"; The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct

clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed"; and "potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks. Training for custody staff has been limited. Follow up with the suicidal inmate has been poor."

68.     Former Sheriff Glanz only read the first two or three pages of the 2010 NCCHC Report. Former Sheriff Glanz is unaware of any policies or practices changing at the Jail in response to 2010 NCCHC Report.

69.     Over a period of many years, Tammy Harrington, R.N., former Director of Nursing at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates. The deficiencies observed and documented by Director Harrington include: chronic failure to triage inmates' requests for medical and mental health assistance; a chronic lack of supervision of clinical staff; and repeated failures of medical staff to alleviate known and significant deficiencies in the health services program at the Jail.

70.     On September 29, 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported its findings in connection with an audit of the Jail's medical system - pertaining to U.S. Immigration and Customs Enforcement ("ICE") detainees -- as follows: "CRCL found a prevailing attitude among clinic staff of indifference"; "Nurses are undertrained. Not documenting or evaluating patients properly."; "Found one case clearly demonstrates a lack of training, perforated appendix due to lack of training and supervision"; "Found two detainees with clear mental/medical problems that have not seen a doctor.";

13

"[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years".

71.     Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued.

72.     On the contrary, less than 30 days later the ICE-CRCL Report was issued, on October 27, 2011 another inmate, Elliott Earl Williams, died at the Jail as a result of truly inhumane treatment and reckless medical neglect which defies any standard of human decency.  A federal jury has since entered a verdict holding Sheriff Regalado liable in his official capacity for the unconstitutional treatment of Mr. Williams.

73.     In the wake of the Williams death, which was fully investigated by TCSO, Former Sheriff Glanz made no meaningful improvements to the medical system. This is evidenced by the fact that yet another inmate, Gregory Brown, died due to grossly deficient care just months after Mr. Williams.

74.     On November 18, 2011 AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Former Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality."  AMS-Roemer specifically commented on no less than six (6) inmate deaths, finding deficiencies in the care provided to each.

75.     It is clear that Former Sheriff Glanz did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail. For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure

to follow NCCHC guidelines "to get patients to providers," and "[n]ot enough training or supervision of nursing staff."

76.     In November 2013, BOCC/TCSO/Former Sheriff Glanz retained Armor Correctional Health Services, Inc. ("Armor") as its private medical provider. However, this step did not alleviate the constitutional deficiencies with the medical system. Medical staff was still undertrained and inadequately supervised and inmates were still denied timely and sufficient medical attention. Bad medical and mental health outcomes persisted due to inadequate supervision and training of medical staff, and due to the contractual relationship between BOCC/TCSO/Former Sheriff Glanz and ARMOR (which provided financial disincentives for the transfer of inmates in need of care from an outside facility).

77.     In February 2015 an auditor/nurse hired by Tulsa County/TCSO, Angela Mariani, issued a report focused on widespread failures by ARMOR to abide by its $5 million annual contract with the County. Mariani also wrote three (3) memos notifying TCSO that ARMOR failed to staff various medical positions in the Jail and recommending that the county withhold more than $35,000 in payments.  Her report shows that Jail medical staff often failed to respond to inmates' medical needs and that ARMOR failed to employ enough nurses and left top administrative positions unfilled for months. Meanwhile, medical staff did not report serious incidents including inmates receiving the wrong medication and a staff member showing up "under the influence."

78.     In approximately December 2016, the County/Sheriff Regalado retained Turn Key as the Jail's medical contractor. Turn Key's CEO, Flint Junod, was Armor's Vice President of the Jail's region during Armor's tenure as the Jail's private medical provider and he was aware of deficiencies in the medical care provided at the Jail prior to and at the time Turn Key was retained.

79.     The County/Sheriff Regalado replaced Armor with Turn Key in large part because Angela Mariana had concluded, in October 2016, that "[s]ince Armor has been [the medical provider at the Jail] there have been significant issues with no improvement. I am concerned that we have seen the best they can offer because these issues have been addressed and no improvements made."

80.     For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state.  Turn Key used its political connections to obtain contracts in a number of counties, including Tulsa County, Muskogee County, Garfield County and Creek County.

81.     Turn Key has demonstrated, over a period of years, that its medical delivery system and "plan" is dangerously deficient. At least by the time of Mr. Stith's death, the County/TCSO knew, or should have known, that Turn Key's grossly deficient system and "plan" posed excessive risks to the health and safety of inmates, like Mr. Stith, who suffer from serious and complex medical conditions.

82.     To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

83.     There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care.

84.     Under the Contract, Turn Key is responsible to pay the costs of all pharmaceuticals at the Jail.  And TCSO/Tulsa County is responsible for the costs of all inmate hospitalizations and off-

site medical care.  These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail to avoid off-site medical costs.

85.     These financial incentives create risks to the health and safety of inmates like Mr. Stith who have complex and serious medical and mental health needs, such as, diabetes, seizure disorders heart disease, bipolar disorder, schizophrenia, dementia, and COVID-19.

86.     Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs, including opiate withdrawal, heart disease and seizure disorder.

87.     Specifically, Turn Key's has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

88.     These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs, diabetes, drug and/or alcohol withdrawal, heart disease, respiratory disease and seizure disorder.

89.     Like the Jail's previous medical providers, Turn Key has an established policy, practice, and/or custom of allowing undertrained and under-supervised LPNs to, *de facto*, run the medical unit at the Jail.

90.     Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

91.     Decisions related to the assessment and treatment of Plaintiff were largely made by LPNs

17

who failed to refer Mr. Stith to a physician.

92.     Indeed, Mr. Stith ***was never seen by a physician*** at the Jail.

93.     Additionally, Mr. Stith was not provided with crucial medications to treat his hypertension, dropping pulse rate or dementia, despite multiple Turn Key providers documenting Mr. Stith's serious and progressively worsening symptoms throughout the 16 days he was at the Jail.

94.     Turn Key's corporate policies, practices and customs as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Mr. Stith's.

95.     For instance, in June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

96.     An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

97.     A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints -- over several days -- of breathing problems were disregarded by responsible staff, and he lost consciousness.

98.     Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016.  Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated.  Smith asserts that he told the Turn Key-employed

physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He lay in his own urine and feces because the jail staff told Smith he was faking paralysis and refused to help him.

99.     In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon,

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … ***He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection*** in result of his critical illness [and] hospitalization, but then ***while in jail, he deteriorated significantly and his <u>clinical deterioration</u> <u>went</u> <u>unrecognized</u> <u>and</u> <u>untreated</u>*** until he was ***nearly completely quadriplegic.***

(emphasis added).

100.    On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

101.   Like Mr. Stith, Mr. Lee was largely assessed and treated by LPNs during his nearly three-week incarceration at the Jail before his death.

102.   Indeed, a physician never once saw Mr. Lee for a week before his death, despite the fact that his symptoms and conditions, including hypertension, bipolar disorder, and hallucinations, continued to deteriorate.

103.   In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County Jail jailers were aware of the same symptoms and performed wholly inadequate, less than one second long sight checks of Mr. Kessee throughout the last hours of his life. Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

104.   On September 6, 2019, Dunniven Phelps was booked in to the Tulsa County Jail.

105.   During the book-in process, on September 6 at approximately 7:35 p.m., Turn Key employee/agent Richard Dutra filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Mr. Phelps was being treated for hypertension (high blood pressure) at the time and had been prescribed medication by his physician to treat the condition.  During the intake screening process, Mr. Dutra further documented that Mr. Phelps was diabetic and had previously been diagnosed with mental health conditions.

106.   During the medical intake process, Mr. Phelps complained that he had a severe headache, neck pain, and burry vision, which are common symptoms of a stroke.

107.   Despite the fact that Mr. Phelps told Mr. Dutra about his current symptoms and history of hypertension, Mr. Dutra recommended that Mr. Phelps be placed in general population and

that he did not need a referral for a continuity of care plan.

108.   Throughout the night of September 6, 2019, Mr. Phelps' symptoms significantly worsened, as he was obviously suffering from a stroke.

109.   By the morning of September 7, Mr. Phelps was experiencing severe weakness on the entire left side of his body, leaving him barely able to walk, as his left leg was almost completely numb.

110.   At approximately 9:37 a.m. on September 7, Turn Key Nurse Patty Buchanan "assessed" Mr. Phelps, who told her that he could hardly feel or move the left side of his body and his other symptoms, such as dizziness and blurred vision, were worsening. Nurse Buchanan recorded Mr. Phelps' blood pressure as 163/103, which the American Heart Association classifies as Stage 2 hypertension.

111.   Nurse Buchanan failed to inform a physician or even an RN or Nurse Practitioner about Mr. Phelps' alarming symptoms and worsening condition, in deliberate indifference to his serious medical needs.

112.   Further, while Nurse Buchanan allegedly counseled Mr. Phelps on the importance of taking his medications, there is no evidence that she, or anyone else at TCSO/Turn Key, ***ever gave Mr. Phelps any medications during his time at the Jail.***

113.   On one occasion, when Mr. Phelps could not get off of the ground because he could not use his left leg or left arm, a DO threatened to "Taze" Mr. Phelps if he didn't get off the ground.

114.   Mercifully, an inmate who was an amputee let Mr. Phelps use his wheelchair so that he could try to get an actual medical assessment and treatment at the medical unit of the Jail.

115.   At approximately 2:19 p.m. on September 7, a DO finally agreed to wheel Mr. Phelps to the medical unit, where he was seen by Nurse Gann.

116.   Shockingly, Nurse Gann thought Mr. Phelps was faking his emergent condition. Jail

surveillance video shows Mr. Phelps lying on the ground in the medical unit, unable to walk, stand, or effectively use his arms, while Nurse Gann drops a piece of paper onto his face, presumably because she thought Mr. Phelps would move out of the way if he was capable of moving. Nurse Gann and other Turn Key personnel left Mr. Phelps lying on the floor, helpless and in immeasurable pain.

117. At 4:05 p.m. on September 7, Mr. Phelps was finally seen by Elizabeth Martin, Advanced Practical Registered Nurse ("APRN").

118. APRN Martin noted that Plaintiff had a ***"3 day history of evolving stroke like symptoms."*** She also noted that Plaintiff's "speech [was] slurred" and that he had "left side facial droop" and weakness on his left side. By this time, Plaintiff's blood pressure was 183/114, which is considered a ***hypertensive crisis that requires immediate consultation and assessment by a physician.***

119. Mr. Phelps was finally sent to Hillcrest Medical Center at approximately 6:15 p.m. on September 7, 2019.

120. Once at Hillcrest, Mr. Phelps was transferred to the Intensive Care Unit ("ICU") where physicians provided emergent, live-saving treatment.

121. Unfortunately, the delay in treating Mr. Phelps, due to Turn Key and Jail staff's deliberate indifference, resulted in Mr. Phelps suffering permanent damage.

122. Mr. Phelps is now permanently paralyzed on the entire left side of his body and will require significant medical treatment for the rest of his life.

123. From June to October 2019, Bryan Davenport, an inmate at the Cleveland County Jail, was denied adequate medical care by Turn Key personnel. Mr. Davenport informed Turn Key staff that he had hypertension and HIV, yet he was not seen by a physician, physician's assistant, or nurse practitioner for nearly a month after his arrival at the jail. Davenport provided Turn Key

staff with the names of his providers, his need for HIV medications, and the names of those medications. When a Turn Key nurse finally saw Davenport, she told him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring him to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15/visit.

124.   In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as Turn Key and its employees ignored the obvious and severe worsening of his condition, including extreme edema and swelling, fluid leaking from his legs, urinary incontinence, and clear sings of infection. Turn Key staff failed to properly assess, evaluate, or treat the inmate and failed to refer him to a more highly trained provider or an outside medical provider.

125.   In July 2021, an inmate named Perish White died of COVID-19, which he contracted in the Creek County Jail.

126.   Mr. White began feeling ill on or about July 5, 2021, and reported his symptoms to Turn Key staff at the Creek County Jail.

127.   By July 8, 2021, at the latest, Mr. White began experiencing shortness of breath and coughing. On information and belief, Mr. White also stopped eating and was refusing meal trays. These drastic changes in Parish's condition, particularly in light of the ongoing COVID-19 pandemic, made it obvious, even to a layperson, that Perish needed emergent evaluation and treatment from a physician.

128.   ***From July 5 to July 16, 2021, Turn Key staff never once took Mr. White's vital signs,*** despite his repeated complaints that he was seriously ill, his obvious symptoms, and the fact that COVID-19 was raging through the Creek County Jail.

129.   On July 19, 2021, Mr. White was finally taken to OSU Medical Center in Tulsa for COVID-19 and respiratory failure. At the time, his oxygen saturation level was in the 70's. He was diagnosed with acute kidney failure. He was placed on life support, including a ventilator and dialysis.

130.   Mr. White died on July 30, 2021.

131.   On April 13, 2021, Christa Sullivan died at the Oklahoma County Jail ("OCJ"), which also uses Turn Key as its jail medical provider.

132.   Ms. Sullivan had a history of severe mental illness, including depression, bipolar disorder, schizophrenia, and several previous suicide attempts.

133.   Ms. Sullivan was housed at the OCJ for nearly a year prior to her death. Throughout her time at OCJ, she exhibited extremely serious symptoms, including multiple instances of self-harm, suicidal ideation, a refusal to eat or drink, rapid weight loss, and catatonia.

134.   Approximately two months before Ms. Sullivan's death, numerous Turn Key providers, including nurses and two physicians, acknowledged Ms. Sullivan's emergent conditions and the fact that it was impossible for Ms. Sullivan to receive the life-saving care she needed in a jail setting.

135.   In fact, one Turn Key physician noted, with respect to Ms. Sullivan:

> ***DEPRESSED AFFECT, SEVERE ADULT FAILURE TO THRIVE. SEEMS AT HIGH RISK FOR POOR OUTCOME. I HAVE DISCUSSED HER CASE WITH PSYCHE, NURSING, AND WOUND CARE AND DO NOT SEE ANY LIKELY TO SUCCEED INTERVENTIONS IN THIS SETTING. SHE DOES NOT SEEM COMPETENT BY ANY BEHAVIORAL PARAMETER THAT I CAN SEE. WILL REDISCUSS OPTIONS WITH DR. CUKA AND DR. COOPER***.

136.   Yet Turn Key providers allowed Ms. Sullivan to languish in her cell for months, cationic and barely eating, until her eventual death.

137.   After Ms. Sullivan's death, Kevin Wagner, a Captain at OCJ told an investigator, "[Ms. Sullivan] went from 148 when she got here to … ***she looks like a skeleton.***" Captain Wagner

also told the investigator he helped get Ms. Sullivan to a local hospital for a week at one point "because I felt that *medical (in the Jail) wasn't providing her care enough."*

138.   Another staff member told an investigator that Ms. Sullivan deteriorated *"to a bag of bones."*

139.   On August 3, 2021, Gregory Neil Davis was arrested by Oklahoma City Police Department ("OCPD") Officers and transported to the OCJ.

140.   Mr. Davis was charged with indecent exposure, and was observed by officers to be in the midst of an obvious mental health crisis.

141.   Upon arriving at the OCJ, Mr. Davis was not evaluated by Turn Key personnel, nor was he tested for COVID-19 or have his vital signs taken.

142.   Mr. Davis was finally seen by a Turn Key provider, Sanaria Okongor, LPC, on August 6, 2021. Ms. Okongo noted that Mr. Davis suffered from signs of psychosis, but she made no treatment recommendations or took any actions other than to recommend follow-up a few days later.

143.   Ms. Okongor saw Mr. Davis again on August 9, 2021 and again noted he appeared to be suffering from psychosis. Ms. Okongor again failed to make any treatment recommendations or take any actions, including taking vital signs or referring Mr. Davis to a higher-level provider.

144.   For at least the final few days of Mr. Davis's life – from August 9-12, 2021 – inmates in nearby cells heard Mr. Davis beating at his cell door, crying, and begging for medical help but no one came to assist him, provide him medical care, or refer him to a physician or outside medical provider.

145.   On the morning of August 12, 2021, at approximately 6:45 a.m., Mr. Davis was observed in his cell in need of emergency medical attention by Lt. Morris and Ronald Anderson, employees and/or agents of the Oklahoma County Criminal Justice Authority ("OCCJA").

146.    Upon information and belief, EMSA was not called until approximately 9:17 a.m. When EMSA arrived, paramedics transported Mr. Davis to a nearby hospital, where he was pronounced dead.

147.    Mr. Davis died of a perforated duodenal ulcer, a condition that does not normally result in death unless left untreated for a substantial period of time, often more than 24 hours.

148.    From August 3-12, 2021, the only Turn Key personnel who saw, evaluated, assessed, or "treated" Mr. Davis was an LPC, who saw Mr. Davis on two occasions.

149.    Mr. Davis was never seen by a Turn Key physician nor was he referred to an outside medical provider other than the day of his death, when it was far too late.

150.    In August 2021, Larry Price, an intellectually disabled, 55-year-old inmate at the Sebastian County (Arkansas) Adult Detention Center, starved to death after responsible jail and Turn Key personnel failed to properly treat his medical and mental health conditions, including schizophrenia, for a year.

151.    The six foot, two inch Mr. Price entered the jail weighing approximately 185 pounds. By the time he was found unresponsive in his cell 366 days later, he weighed 90 pounds according to EMS reports. He had also been ingesting his own urine and feces according to reports.

152.    The medical examiner's report noted that Mr. Price was COVID-19 positive when he died, but the official cause of death was listed as "acute dehydration and malnutrition."

153.    For over a year, Turn Key personnel watched as Mr. Price deteriorated both physically and mentally, doing nothing to assess, evaluate, or treat his conditions. Nor did Turn Key personnel refer Mr. Price to an outside medical provider.

154.    In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates.  And each of these inmates, with obvious, serious and emergent medical and mental health conditions, was kept at the jail when they clearly should have been

transported to a hospital or other off-site provider capable of assessing and treating the conditions.

155.   By its design, the Turn Key medical system was destined to fail.

156.   At all pertinent times, Dr. William Cooper, D.O., was the "Medical Director" for Turn Key.   In an effort to cut costs, Turn Key and Dr. Cooper spread the few physicians and mid-level providers they employ far too thin, making it impossible for them to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

157.   In essence, Turn Key employs a small number of mid-level providers, such as physician's assistants or nurse practitioners, and physicians who travel all over the State (and sometimes to other states, such as Arkansas and Kansas) to each of jails for short blocks of time.   This constitutes plainly insufficient medical staffing, particularly for a large institution like the Tulsa County Jail.

158.   With no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their training.

159.   In other words, Turn Key had a policy, practice or custom of inadequately staffing county jails, including the Tulsa County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Mr. Stith, with complex and serious medical and mental health needs, including diabetes, drug and alcohol withdrawal, heart disease, seizure disorder, respiratory disease, bipolar disorder, schizophrenia, and dementia.

160.   With wholly inadequate physician oversight of the clinical care, the non-physician staff was improperly, and dangerously, expected to act in the role of a physician, with the understanding that off-site care was to be avoided.

161.   This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical and mental health conditions, like Mr. Stith, at substantial risk of harm.

162.   This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations.

163.   TCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Mr. Stith at excessive risk of harm.  However, TCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Mr. Stith.

164.   By simply retaining Turn Key as the medical provider at the Jail in light of the obviously substandard care that Turn Key has provided – and continues to provide – to inmates at the Tulsa County Jail and county jails all over Oklahoma, Arkansas, and Kansas, TCSO/the County are deliberately indifferent to inmates' serious medical needs.

165.   TCSO/the County are aware, or should be aware, of Turn Key's repeated failures to provide constitutionally adequate medical care for inmates, yet TCSO/the County have made the conscious decision to retain Turn Key as the Tulsa County Jail's medical provider.

166.   Moreover, Dr. Cooper, Turn Key's Medical Director, has maintained a policy, at the corporate level, of intentionally omitting information about inmates' negative health outcomes from written documentation, and has ordered Turn Key personnel to keep such bad news out of written communications.

167.   This policy, in and of itself, constitutes deliberate indifference to the health and safety of Turn Key's patients.

168.   Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Mr. Stith.

169.   In addition, TCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Mr. Stith, with complex or serious medical needs, with deliberate indifference to the health and safety of those inmates.

170.    TCSO's failure to train and supervise Jail staff was admitted in 2018 by the TCSO Jail Administrator, who sent an email to Jail supervisors concerning Jail staff's many failures, in which he concluded: "What I see now is either people don't have the abilities to complete or excel in their positions which means we as a whole have failed. We either didn't train them, we didn't challenge them, we didn't hold them accountable (which doesn't always mean discipline)...."

## CAUSES OF ACTION

### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

171.    Paragraphs 1-170 are incorporated herein by reference.

**A.    Underlying Violations of Constitutional Rights/Individual Liability**

172.    The Turn Key/TCSO staff, including Nurse Lewis and APNR Hilger, as described above, knew there was a strong likelihood that Mr. Stith was in danger of serious harm.

173.    As described *supra*, Mr. Stith had serious and emergent medical and mental health issues that were known and obvious to the Turn Key/TCSO employees/agents. It was obvious that Mr. Stith needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and obstructed. Turn Key/TCSO employees/agents, including Nurse Lewis and APNR Hilger, disregarded the known, obvious and substantial risks to Mr. Stith's health and safety.

174.    As a direct and proximate result of this deliberate indifference, as described above, Mr. Stith experienced unnecessary physical pain, a worsening of his conditions, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and death.

175.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

B.    **Municipal/"Monell" Liability (Against Turn Key)**[5]

176.    Paragraphs 1-175 are incorporated herein by reference.

177.    Turn Key is a "person" for purposes of 42 U.S.C. § 1983.[6]

178.    At all times pertinent hereto, Turn Key was acting under color of State law.

179.    Turn Key has been endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

180.    Turn Key is charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and has shared responsibility to adequately train and supervise its employees.

181.    In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

182.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Mr. Stith's serious

---

[5]    "A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell* [*v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1977), 98 S.Ct. 2018], **or** for an action by an authority with final policy making authority, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." *Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Plaintiff's municipal liability claim in this action is based upon a *Monell* theory of liability, thus he need not establish that Turn Key had final policymaking authority for Tulsa County.

[6]    "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to private § 1983 defendants." Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) (emphasis added). *See also Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005).

medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key.

183.    To the extent that no single officer or professional violated Mr. Stith's constitutional rights, Turn Key is still liable under a theory of a systemic failure of  policies and procedures as described herein. There were such gross deficiencies in medical procedures, staffing and facilities and procedures that Mr. Stith was effectively denied constitutional conditions of confinement.

184.   Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Stith.  Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Mr. Stith's, serious medical needs.

185.   Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

186.   Additionally, Turn Key has maintained a healthcare delivery system at a corporate level, including at the Tulsa County Jail, that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

187.   There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Plaintiff's injuries and damages as alleged herein.

188.   Turn Key is also vicariously liable for the deliberate indifference of its employees and agents.

**C.    Official Capacity Liability (Against Sheriff Regalado)**

189.   Paragraphs 1-188 are incorporated herein by reference.

190.   The aforementioned acts and/or omissions of TCSO and/or Turn Key staff in being

deliberately indifferent to Mr. Stith's health and safety and violating Mr. Stith's civil rights are causally connected with customs, practices, and policies which the County/TCSO promulgated, created, implemented and/or possessed responsibility for.

191.   Such policies, customs and/or practices are specifically set forth, *supra*.

192.   The County/TCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Mr. Stith's, health and safety.

193.   The County/TCSO has maintained a healthcare delivery system at the Jail that has such "gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

194.   As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Stith suffered injuries and damages as alleged herein.

195.   As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

### NEGLIGENCE
### (Against Turn Key)

196.   Paragraphs 1-195 are incorporated herein by reference.

197.   Turn Key is vicariously liable for the acts of its employees and/or agents under the doctrine of *respondeat superior.*

198.   Turn Key, through its employees and/or agents at the Tulsa County Jail, owed a duty to Mr. Stith, and all other inmates incarcerated at the Tulsa County Jail, to tender medical treatment

with reasonable care, taking caution not to cause additional harm during the course of medical treatment.

199.    As described herein, Turn Key, through its employees and/or agents, breached its duty to Mr. Stith, by failing to provide competent and timely medical treatment as required by applicable standards of care, custom and law.

200.    Turn Key staff failed to provide adequate or timely evaluation and treatment, even as Mr. Stith's known medical and mental health conditions deteriorated. Agents and/or employees of Turn Key failed to reasonably or timely treat Mr. Stith's serious medical conditions, and prevented his timely transfer to a medical facility for emergent care.

201.    Turn Key's negligence is the direct and proximate cause of Mr. Stith's physical pain, severe emotional distress, mental anguish, death, and the damages alleged herein.

202.    As a result of Turn Key's negligence, Plaintiff is entitled to damages.

**WHERFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Robert M. Blakemore
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Muskogee, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F

***Attorneys for Plaintiff***