# 𝔘nited 𝔖tates 𝔇istrict 𝔆ourt
## for the 𝔑orthern 𝔇istrict of ᕶklahoma

---

Case No. 24-cv-6-JDR-SH

---

ALANA CRAWFORD, *as Special Administrator of* THE ESTATE OF DEAN STITH, *deceased*,

*Plaintiff*,

*versus*

TURN KEY HEALTH CLINICS, LLC; VIC REGALADO, *in his official capacity*; SARAH LEWIS, LPN; RHONDA HILGER, APRN,

*Defendants*.

---

## OPINION AND ORDER

---

Dean Stith was arrested on Christmas Eve for falsely reporting a crime. During his two-week detention at the Tulsa County Jail, Mr. Stith's physical and mental condition deteriorated until he was found unresponsive in his cell. He was transferred to the hospital and died shortly after arrival. Plaintiff Alana Crawford, the special administrator of Mr. Stith's estate, alleges that Defendants Turn Key Health Clinics, LLC, Sheriff Vic Regalado, Sarah Lewis, LPN, and Rhonda Hilger, APRN, were deliberately indifferent to Mr. Stith's serious medical needs during his detention. She also alleges that Turn Key was negligent in Mr. Stith's medical care. The Defendants have moved to dismiss the claims, arguing that Ms. Crawford has failed to state a claim upon which relief can be granted. Dkts. 22, 23, 24, 25. For the reasons discussed below, Nurse Lewis, Nurse Hilger, and Sherrif Regalado's motions are denied. Turn Key's motion is granted in part and denied in part.

No. 24-cv-6

I

Ms. Crawford alleges that Mr. Stith was arrested on December 24, 2021, and taken to the Tulsa County Jail. Dkt. 2 at ¶ 11. At the time of his arrest, Mr. Stith was fifty-five years old and had several pre-existing medical conditions: hypertension, bipolar disorder, schizophrenia, and dementia. *Id.* at ¶ 12. Mr. Stith's intake form, which was completed in the early morning hours of December 25, 2021, notes that he "was being treated for hypertension; had an unstable gait; had open sores and wounds on both of his hands; and was disheveled, disorderly, and insensible." *Id.* at ¶ 14. At intake Mr. Stith's blood pressure was 152/81, and his sitting pulse was 94. *Id.* at ¶ 16. Because of this reading, the licensed practical nurse completing the intake charted "task for bp checks for 1 week, then chronic care for chart check." *Id.* at ¶ 17.

Mr. Stith was initially housed with the general population in the jail. *Id.* at ¶ 18. His blood pressure was taken again on December 25 and on December 28, and measured at 147/92 and 143/94, respectively. *Id.* at ¶¶ 19-20. Despite these high readings, Mr. Stith was not prescribed any medication to lower his blood pressure or referred to a physician. *Id.* at ¶ 20. On December 29, one of Turn Key's licensed professional counselors met with Mr. Stith and noted that he "appeared to become agitated over his water being shut off." *Id.* at ¶ 23. The counselor "attempted to redirect/calm [Mr. Stith] down but unable to calm him down. [Mr. Stith] refused to answer questions, [and] continued to ask … for water. Referral to restart meds. F/U as needed." *Id.* On December 31, Mr. Stith submitted a grievance to the jail that read his "skin [is] peeling off please help me. [P]lease." *Id.* at ¶ 24.

Another licensed professional counselor, Sarah Hardy, met with Mr. Stith on January 4, 2022, and noted that Mr. Stith did not recognize her even though she had met with him before. *Id.* at ¶¶ 26-27. She also noted that Mr. Stith was "focused on getting more food," "was hiding his tray under his bed," his "skin appeared very dry," and he was mumbling. *Id.* at ¶¶ 27-28.

No. 24-cv-6

Ms. Hardy did not refer Mr. Stith to a physician or provide any treatment. *Id.* at ¶ 29.

Ms. Hardy met with Mr. Stith again on January 5, 2022, and noted that Mr. Stith was "anxious/agitated, angry/oppositional" and "refused to engage." *Id.* at ¶ 31. When a Turn Key nurse practitioner met with Mr. Stith later that day, she noted that he was alert and oriented to person and place only and was exhibiting pitting edemas on his legs with multiple open areas. *Id.* at ¶ 32. She recommended that Mr. Stith wear compression hose, but noted he was "noncompliant." *Id.*

The next day, Mr. Stith was moved from the jail's general population to the medical housing unit, where a licensed practical nurse charted that Mr. Stith had continued to be unsteady on his feet since intake and had an unsteady gait. *Id.* at ¶¶ 33-35. A little after 3:00 p.m., Ms. Hardy met with Mr. Stith again and noted that he appeared disheveled, was still anxious, agitated, angry, oppositional, and asked several times what time it was and if the light could be turned off. *Id.* at ¶ 36. The next day, Mr. Stith's blood pressure was 101/68 and his pulse was 60. *Id.* at ¶ 37. His oxygen saturation was not taken. *Id.* A nurse practitioner noted that Mr. Stith "appeared to be responding to internal stimuli." *Id.* at ¶ 38.

On January 8, 2022, Mr. Stith's blood pressure was 124/97 and his pulse was 98. *Id.* at ¶ 39. Although these levels were over 20 points higher than the previous day's reading, Mr. Stith was not given blood pressure medicine or any additional treatment. *Id.* Later that day, Turn Key psychologist Alicia Irvin met with Mr. Stith and noted that Mr. Stith was confused, disoriented, and did not cognitively comprehend the interaction. *Id.* at ¶¶ 40-41. Dr. Irvin's treatment plan was to keep observing Mr. Stith. *Id.* at ¶ 41.

The next day, Dr. Irvin met with Mr. Stith again at 10:30 a.m. *Id.* at ¶ 42. She noted that Mr. Stith exhibited signs of dementia and slurred speech, and was not responding appropriately to questions. *Id.* She attributed these

3

No. 24-cv-6

symptoms to a "Major Neurocognitive Disorder." *Id.* Around this time, Mr. Stith's pulse was 56. *Id.* at ¶ 43. At 2:46 p.m., Nurse Lewis described Mr. Stith as "drooling, [having] tangential thought, not responding appropriately to questions, [having] diminished skin turgor, 2+ pitting edema to BLEs, and full body weakness," and being unable to urinate. *Id.* at ¶ 45. Despite these symptoms, Nurse Lewis did not call for an ambulance or contact a physician. *Id.* at ¶ 46. Ms. Crawford alleges that either Nurse Lewis failed to report these symptoms or reported the symptoms to Nurse Hilger who then failed to direct Nurse Lewis to call an ambulance. *Id.* at ¶¶ 47-48.[1]

At 4:05 a.m. on January 10, 2022, a detention officer found Mr. Stith wedged between his bunk and the wall in his cell. *Id.* at ¶ 49. He was "cool to the touch and [had his] arms contracted to his chest." *Id.* When an ambulance arrived at the jail at 4:39 a.m., Mr. Stith was unresponsive. *Id.* at ¶ 50. The responding paramedics noted that Mr. Stith was displaying decorticate posturing and that the "health care staff [at the jail were] poor historians and [were] unsure of timeline." *Id.* at ¶¶ 50-51. Mr. Stith's pulse was in the 30's and he was having difficulty breathing. *Id.* at ¶ 52. He was transferred to St. John Medical Center where he presented in cardiac arrest. *Id.* at ¶ 53. He died shortly after arrival. *Id.* at ¶ 54. Mr. Stith's causes of death were acute

---

[1] Nurse Hilger and Nurse Lewis argue that pleading "inconsistent factual allegations [is] improper under Rule 8(d), and the Court cannot accept both factual allegations as true for purposes of the Motion to Dismiss." Dkt. 40 at 3. Dkt 41 at 3-5. But Rule 8(d)(2) states that "[a] party may set out 2 or more statements of a claim … alternatively or hypothetically, either in a single count … or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Further, "[a] party may state as many separate claims … as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Ms. Crawford's alternative factual allegations relate to separate counts. The Court will consider Ms. Crawford's allegation that Nurse Lewis did not call Nurse Hilger as true for purposes of the claim against Nurse Lewis. The Court will also consider Ms. Crawford's allegation that Nurse Lewis notified Nurse Hilger of Mr. Stith's medical condition as true for purposes of the claim against Nurse Hilger. *See, e.g., Doe v. Nebo Sch. Dist.*, 733 F. Supp. 3d 1139, 1149 (D. Utah 2024) (holding that inconsistent pleading survived the motion to dismiss but the "argument may be raised after additional factual development at summary judgment and, possibly, at trial").

No. 24-cv-6

bronchopneumonia due to complications of COVID-19 and hypertensive atherosclerotic cardiovascular disease. *Id.* at ¶ 55.

Ms. Crawford sued Defendants on behalf of Mr. Stith's estate, asserting claims under 42 U.S.C. § 1983 for violations of Mr. Stith's Fourteenth Amendment rights. Dkt. 2. She claims that the Defendants were deliberately indifferent to Mr. Stith's serious medical needs and that Turn Key was negligent in his care. The Defendants have moved to dismiss the complaint, arguing that Ms. Crawford has failed to allege that a constitutional violation occurred or that any of the named defendants were responsible for it. Dkts. 22, 23, 24, 25.

II

When considering whether Ms. Crawford's complaint states a viable claim for relief, the Court must determine whether the pleading contains enough "factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). At this stage, the Court must accept Ms. Crawford's well-pleaded factual allegations as true and construe them in the light most favorable to her. *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022). The Court "'will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable.'" *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)).

Three of the Defendants ask the Court to look beyond the pleadings and consider Mr. Stith's full patient history, which they attach to their motions to dismiss. Dkts. 22-1; 24-1; 25-1. They argue that Ms. Crawford "should not be permitted to use the medical record as the backbone of the Complaint, while intentionally omitting material portions of the medical record in order to sustain a deficient claim." Dkts. 24 at 13; 25 at 14. Generally,

No. 24-cv-6

courts should consider only the contents of the complaint when ruling on a Rule 12(b)(6) motion to dismiss. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). But courts may consider a document "outside the four corners of a complaint in deciding a Rule 12(b)(6) motion if the document is (1) central to the plaintiff's claim, (2) referred to in the complaint, and (3) free of any genuine dispute over its authenticity." *See Tufaro v. Okla. ex rel. Bd. of Regents of the Univ. of Okla.*, 107 F.4th 1121, 1131 (10th Cir. 2024).

The Court declines to consider Mr. Stith's patient history in ruling on Defendants' motions to dismiss. *See, e.g., Morris v. City of Tulsa*, No. 19-cv-0073-CVE-JFJ, 2019 WL 7373035, at *3 (N.D. Okla. Dec. 31, 2019) ("The limited class of cases in which evidence outside the complaint can be considered in ruling on a motion to dismiss typically involves a contract or insurance action where the contents of the document are undisputed and the parties agree that the document is central to resolution of the case."). Ms. Crawford raised concerns as to whether Mr. Stith's patient history is "complete, accurate, or even authentic." Dkts. 33 at 13; 34 at 13; 35 at 14. Medical records are not akin to a contract or insurance policy where there is no dispute as to the authenticity or accuracy of the document.

As to the Defendants' fairness concerns, "Rule 11 normally does not require [plaintiffs] to uncover and to set forth the facts that support the other side's position." *Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 467 (1st Cir. 1993) (citation omitted). As this Court has previously held, Ms. Crawford is not required at the pleading stage to provide a full and detailed summary of *all* treatment provided by the Defendants when her claims turn on the denial of *proper* treatment. *See Lucas v. Turn Key Health Clinics, LLC*, No. 20-cv-601-JDR-CDL, 2024 WL 913832, at *5 (N.D. Okla. Mar. 4, 2024). Ms. Crawford did this by setting forth a short and plain statement of facts demonstrating that the proper treatment or referral was not provided. Accordingly, the Court will not consider the records provided by Defendants.

No. 24-cv-6

### III

Nurse Hilger and Nurse Lewis argue that the claims brought against them should be dismissed because Ms. Crawford has failed to sufficiently allege that Mr. Stith's symptoms were indicative of an emergent medical condition. Dkts. 24 at 11-12; 25 at 11-13. As a pretrial detainee, Mr. Stith was entitled to custodial medical care under the Due Process Clause of the Fourteenth Amendment. *See Estate of Beauford v. Mesa Cty.*, 35 F.4th 1248, 1262 (10th Cir. 2022) (stating that the "right to custodial medical care is well settled").[2] To establish a claim for deliberate indifference under 42 U.S.C. § 1983, a plaintiff must satisfy both an objective and a subjective component. As to the objective component, the plaintiff must show that the detainee suffered from a sufficiently serious medical need. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023). A need that results in death is undoubtedly a sufficiently serious medical need. *See, e.g., Cox v. Glanz*, 800 F.3d 1231, 1240 n.3 (10th Cir. 2015) (collecting cases).

The subjective component requires the plaintiff to show that the medical provider knew of and disregarded "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). To satisfy this component,

> [a] plaintiff need not show that a prison official acted or failed to act believing that harm actually would befall an inmate, but rather that the official merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways,

---

[2] There is no difference between the standard of medical care owed to convicted inmates under the Eighth Amendment and the standard applicable to pretrial detainees under the Fourteenth Amendment's Due Process Clause. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Because the analysis applied when reviewing violations of these provisions is the same, the Court relies on authority concerning both types of cases. *Estate of Beauford*, 35 F.4th at 1262.

No. 24-cv-6

including inference from circumstantial evidence such as
whether the risk was obvious. An official disregards risk when
he fails to take reasonable measures to abate the risk.

*Lucas*, 58 F.4th at 1137 (citations and internal quotation marks omitted). The
question, then, is whether Mr. Stith's symptoms were sufficiently serious to
alert Nurse Hilger and Nurse Lewis that Mr. Stith needed either medical
treatment or to be referred for treatment.

At the time Nurse Lewis assessed Mr. Stith, he was drooling, having
tangential thoughts, not responding appropriately to questions, and exhibited
diminished skin turgor, 2+ pitting edema to his legs, and full body weakness.
He was also unable to urinate. Nurse Lewis was aware that Mr. Stith had pre-
existing mental health issues and hypertension, and alleges she was also aware
that his blood pressure had fluctuated by more than twenty points during his
detention. This information, "[p]articularly when coupled with [Mr. Stith's]
worsening condition over a period of days," was sufficient to put Nurse Lewis
on notice of a substantial risk to Mr. Stith's health. Dkt. 2 at ¶ 46. *See Paugh
v. Uintah Cty.*, 47 F.4th 1139, 1158 (10th Cir. 2022) ("[A] reasonable jury
could find that it would have been 'obvious' to any reasonable jail official that
[pretrial detainee] needed medical assistance if the individual Defendants
saw [pretrial detainee's] condition worsening." (citation omitted)). If Nurse
Lewis called Nurse Hilger and relayed these conditions, as alleged, Nurse
Hilger was likewise put on notice of a substantial risk to Mr. Stith's health.

Ms. Crawford must also allege that the nurses either failed to properly
treat Mr. Sith's serious medical condition ("failure to properly treat theory")
or prevented him from receiving treatment or denied him access to someone
capable of evaluating his needs ("gatekeeper theory"). *Lucas*, 58 F.4th at 1137
(citing *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000)). Ms. Craw-
ford alleges that Nurse Lewis failed to report Mr. Stith's medical symptoms
to Nurse Hilger or call an ambulance. Where a medical professional does not

No. 24-cv-6

have final treatment authority, as is the case with Nurse Lewis,[3] and instead acts "'solely … as a gatekeeper for other medical personnel capable of treating the condition,'" that professional may be liable if she "'delays or refuses to fulfill that gatekeeper role.'" *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (quoting *Sealock*, 218 F.3d at 1211). Ms. Crawford has alleged a delay that could give rise to liability under a gatekeeper theory.

Ms. Crawford's alternate allegations also establish the objective component of a § 1983 claim. If, as Ms. Crawford alleges, Nurse Lewis called Nurse Hilger after assessing Mr. Stith at 3:00 p.m. on January 9, Mr. Stith did not receive any further medical care until a detention officer discovered him wedged between his bed and the wall the next morning around 4:00 a.m. Simply calling Nurse Hilger and notifying her of Mr. Stith's symptoms does not relieve Nurse Lewis of liability. *Lucas*, 58 F.4th at 1139 ("[M]erely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability.). The alleged facts show that the nurses failed to treat Mr. Stith or provide him with proper medical care based on their knowledge of his medical condition. *See id*. ("[D]oing nothing in the face of serious medical needs is obviously sufficient to state a claim."). Taking these allegations as true, a reasonable jury could conclude that the seriousness of the medical risks associated with Mr. Stith's symptoms would be obvious to a reasonable observer and that either Nurse Lewis or Nurse Hilger should have provided some type of medical treatment or referral for further medical evaluation between 3:00 p.m. and 4:00 a.m. the next morning. Ms. Crawford has sufficiently alleged deliberate indifference under both a failure to treat theory and a gatekeeper theory. Nurse Lewis and Nurse Hilger's motions to dismiss are denied.

---

[3] Nurse Lewis is a licensed practical nurse. Ms. Crawford alleges that an LPN is "not qualified to make diagnosis or prescribe medication or any kind of treatment plan." Dkt. 2 at ¶ 34 n.2.

No. 24-cv-6

## IV

Turn Key argues that Ms. Crawford's § 1983 claim should be dismissed because the complaint fails to establish a connection between Mr. Stith's injuries and the conduct of Turn Key or its employees. Dkt. 23 at 15-24. Turn Key also argues that it is immune from Ms. Crawford's negligence claim under either the Oklahoma Governmental Tort Claims Act [*Id.* at 25-28] or the statute of limitations [*Id.* at 24-25]. Ms. Crawford responds that she has sufficiently alleged both a *Monell* claim and a vicarious liability claim because Turn Key's deficient policies and procedures caused Mr. Stith's injuries. Dkt. 36 at 12-19.

## A

The Court first addresses Ms. Crawford's *Monell* claim. "Under *Monell*, a plaintiff may sue local governing bodies directly for constitutional violations pursuant to the body's policies." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). *Monell* extends to "'private entities acting under color of state law,' such as medical contractors." *Id.* (quoting *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003)). To bring a *Monell* claim, a plaintiff must allege not only that the employees committed a constitutional violation, but also that a policy or custom was the moving force behind the constitutional deprivation. *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1320 (10th Cir. 1998). A policy or custom can include:

(1) a formal regulation or policy statement;

(2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law;

(3) the decisions of employees with final policymaking authority;

10

No. 24-cv-6

(4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or

(5) the failure to adequately train or supervise employees, so long as that failure results from "deliberate indifference" to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks and citations omitted).

As discussed above, Ms. Crawford has sufficiently alleged constitutional violations by Nurse Lewis and Nurse Hilger, both of whom are Turn Key employees. But this is not, by itself, sufficient. To show that Turn Key was the moving force behind those violations, Ms. Crawford alleges that Turn Key was aware that its "grossly deficient system and 'plan' posed excessive risks to the health and safety of inmates, like Mr. Stith, who suffer from serious and complex medical conditions." Dkt. 2 at ¶ 81. She also alleges that Turn Key has implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care to increase profits, which is further incentivized by its contract with the jail. *Id.* at ¶¶ 82-85. One example of such policy is "allowing undertrained and under-supervised LPNs to, *de facto*, run the medical unit at the jail." *Id.* at ¶ 89. Ms. Crawford alleges that this policy caused Mr. Stith's injuries because he was never seen or treated by a physician while detained at the jail. *Id.* at ¶ 92. Although Ms. Crawford will be required to prove causation, these allegations are sufficient to state a *Monell* claim at this stage in the proceedings. *See, e.g., Miles v. Rogers Cty. Bd. of Comm'rs*, --- F. Supp. 3d ---, 2025 WL 1419783, at *5 (N.D. Okla. May 16, 2025). Turn Key's motion to dismiss Ms. Crawford's *Monell* claim is denied.

## B

Ms. Crawford also alleges that Turn Key is vicariously liable for the deliberate indifference of its employees and agents. Dkt. 2 at ¶ 188. But the

No. 24-cv-6

Supreme Court has been clear that "vicarious liability will not attach under §
1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*,
436 U.S. at 694-95). Turn Key's motion to dismiss Ms. Crawford's vicarious
liability claim is granted.

C

Turning to the state law negligence claim, Turn Key argues that it is
entitled to immunity under the GTCA, Okla. Stat. tit. 51, §§ 151 et seq. Dkt.
23 at 25-29. The Act immunizes "[t]he state, its political subdivisions, and all
of their employees acting within the scope of their employment" from liabil-
ity for torts, such as negligence. Okla. Stat. tit. 51, § 152.1(A). Relevant here,
the GTCA provides that the state and its political subdivisions are exempt
from tort liability stemming from the "[p]rovision, equipping, operation or
maintenance of any prison, jail or correctional facility ...." Okla. Stat. tit. 51,
§ 155(25). The term "employees" is defined to include "licensed medical
professionals under contract with city, county, or state entities who provide
medical care to inmates or detainees in the custody or control of law enforce-
ment agencies." Okla. Stat. tit. 51, § 152(7)(b)(7).

The question of whether Turn Key qualifies as an employee of the
state as contemplated by the Act has been heavily litigated. *See, e.g., Lucas*, 58
F.4th at 1147; *Barrios v. Haskell Cty. Pub. Facilities Auth.*, 2018 OK 90, 432
P.3d 233. Recently, the Oklahoma Supreme Court answered this question in
the affirmative: "Clearly, the scope of sovereign immunity maintained by 51
O.S. § 155(25) for claims resulting from 'equipping, operation or maintenance
of any prison, jail or correctional facility' would include the traditional em-
ployer/employee relationship existing between a licensed medical profes-
sional when contractually supplying medical care to those in custody." *Sand-
ers v. Turn Key Health Clinics*, 2025 OK 19, ¶ 48, 566 P.3d 591, 608. Accord-
ingly, "[t]he 'licensed medical professional' services at the jail are being sup-
plied by 'employees of this state' for the purposes of the GTCA." *Id.* Because
Turn Key, an independent contractor employing licensed medical

No. 24-cv-6

professionals for the jail, is an employee of the state and thus entitled to immunity under the GTCA, Ms. Crawford's negligence claim is dismissed. *See, e.g., Miles*, 2025 WL 1419783, at *6-*7.[4]

## V

Ms. Crawford also asserts a *Monell* claim against Sheriff Regalado in his official capacity as Sheriff of Tulsa County. This claim is, in effect, a claim against Tulsa County. Under Oklahoma law, "a sheriff has a statutory duty to provide medical care to prisoners and is responsible for the proper management of the jail and the proper conduct of the jail personnel." *Estate of Crowell ex rel. Boen v. Bd. of Cty. Comm'rs of Cty. of Cleveland*, 2010 OK 5, ¶31, 237 P.3d 134, 144; Okla. Stat. tit. 57, § 52. Sheriff Regalado has moved to dismiss the claim, arguing that Ms. Crawford has failed to sufficiently allege a constitutional violation or the existence of a municipal policy or custom that was the moving force behind her asserted constitutional violation. Dkt. 22 at 17-27. Because Ms. Crawford has sufficiently alleged a constitutional violation by the nurses, *see supra* Section III, the Court's analysis focuses on whether Ms. Crawford has sufficiently alleged a municipal policy or custom was the moving force behind the violations.

Ms. Crawford alleges that "[t]here are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail" and Sheriff Regalado has "long known of these systemic deficiencies and the substantial risks they pose to inmates … but failed to take reasonable steps to alleviate those deficiencies and risks." Dkt. 2 at ¶ 58. She alleges that issues with the jail's medical care were reported from 2007 to 2016. *Id.* at ¶¶59-66. She further alleges that, after Sheriff Regalado took over in 2016, Tulsa County retained Turn Key as the jail's medical contractor despite knowing of these failures. *Id.* at ¶ 78.

---

[4] Because Turn Key is entitled to immunity, there is no need to address its statute of limitations argument.

No. 24-cv-6

Ms. Crawford further alleges that there have been numerous instances where inmates have been severely injured or have died under Turn Key's care while detained or incarcerated. *Id.* at ¶¶ 103-153. Based on this pattern of inmate injuries and deaths while under Turn Key's care, Sheriff Regalado was allegedly "on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Mr. Stith at excessive risk of harm." *Id.* at ¶ 163. He nevertheless "failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Mr. Stith." *Id.* Ms. Crawford further alleges that "TCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Mr. Stith, with complex or serious medical needs .…" *Id.* ¶ 169. Ms. Crawford has identified several policies including keeping patients onsite for care, inadequate staffing, lack of access to a physician, and failure to train or supervise, that gave rise to the violation at issue in this case.

Ms. Crawford has sufficiently alleged that a TCSO policy to keep inmates onsite for care may have been the moving force behind Mr. Stith's asserted constitutional violation. She has also sufficiently alleged that inadequate staffing of medical personnel capable of treatment and failure to train or supervise personnel may have been a moving force behind Mr. Stith's asserted constitutional violation. Whether Ms. Crawford can prove that these policies caused Mr. Stith's death is a question for trial; at this stage, she need only allege that TCSO policies, which Sheriff Regalado was aware of, were the moving force behind Mr. Stith's constitutional violation. She has done so here. Sheriff Regalado's motion to dismiss the *Monell* claim is denied.

Sherif Regalado has also moved to dismiss Ms. Crawford's request for punitive damages. Dkt. 22 at 27. Although it is well-established that "a municipality is immune from punitive damages under 42 U.S.C. § 1983," *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981), a punitive damage claim is not an independent cause of action and is not properly at issue in a Rule 12(b)(6) motion. *See, e.g., Mason v. Texaco, Inc.*, 948 F.2d 1546, 1554

No. 24-cv-6

(10th Cir. 1991). Therefore, the Court finds that Sheriff Regalado's motion to dismiss punitive damages is denied.

VI

Because Ms. Crawford has sufficiently alleged a constitutional violation, Nurse Lewis and Nurse Hilger's motions to dismiss [Dkt. 24, 25] are denied. Turn Key's motion to dismiss [Dkt. 23] is granted as to the vicarious liability and negligence claims; it is denied as to the *Monell* claim. Sheriff Regalado's motion to dismiss [Dkt. 22] is denied.

DATED this 8th day of July 2025.

JOHN D. RUSSELL
*United States District Judge*